STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Appellant–Defendant,

v.

Kathie NOBLE and Dean Noble,
Appellees–Plaintiffs.

No. 45A03–0509–CV–449.

Court of Appeals of Indiana.

Oct. 6, 2006.

---

John B. Drummy, Eric D. Johnson, Kightlinger & Gray, LLP, Indianapolis, IN, Attorneys for Appellant.

Timothy F. Kelly, Beth L. Brown, Kelly Law Offices, Crown Point, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Appellant-defendant State Farm Mutual Automobile Insurance Company (State Farm) appeals from: (1) the trial court's order granting judgment on the evidence in favor of appellees-plaintiffs Kathie and Dean Noble as to the existence of underinsured motorist (UIM) coverage; (2) the jury's damages award to the Nobles on the UIM claim; and (3) the jury's verdict on the Nobles' bad faith claim together with the award of damages thereon.

We find that a question of fact remains on the UIM claim such that judgment on

the evidence was improper. Consequently, we reverse the judgment of the trial court, vacate the jury verdicts and damages awards on the Nobles' breach of contract and bad faith claims, and remand with instructions to hold a trifurcated trial as explained herein.

### FACTS [1]

The Nobles are a married couple, and for thirty years, they have obtained all of their insurance through State Farm. Kathie and Dean have historically operated as a "team" regarding insurance matters. Appellant's App. p. 131. Their practice was to discuss insurance transactions together, and, following their discussion, Dean conducted the transaction by telephone or in person. Before May 3, 1996, the Nobles were insured under an automobile insurance policy issued by State Farm (the Underlying Policy). The Underlying Policy provided, among other things, liability coverage, medical payment coverage, and UIM coverage in the amount of $100,000 per person.

On May 3, 1996, Dean went to their State Farm agent's office to procure a personal liability umbrella policy (Umbrella Policy). Kathie did not accompany Dean. At the time Dean obtained the Umbrella Policy, he signed a document rejecting UIM coverage under that policy. Kathie admitted that Dean was acting for her when he signed the Umbrella Policy application and that she expected that the coverage he had purchased would apply to her. She also stated, however, that she had never authorized Dean to reject any coverage—including UIM coverage—on her behalf. After Dean procured the Umbrella Policy, State Farm mailed a bill to the Nobles with a declarations page outlining the coverage provided by the policy. The declarations page regarding the Um-

1. We held oral argument in this matter on August 8, 2006, in Indianapolis.

brella Policy indicates that the only coverage provided under the policy was personal liability coverage, and Kathie admitted that the Nobles never paid for UIM coverage under the Umbrella Policy.

On July 12, 1997, Kathie was involved in an automobile accident in Crown Point. The other driver who was involved in the crash admitted that he was 100% at fault. The other driver, however, was underinsured and ultimately settled with Kathie for $25,000, the full value of his insurance coverage.

At impact, Kathie was thrown forward and hit her knees under the dash of her vehicle. She sustained seatbelt burns and bruises across her chest and hips. Kathie was taken from the scene of the accident to the emergency room, where the doctors determined that Kathie had no fractures and released her with instructions to follow up with her regular doctor. Following the accident, Kathie, a hospital floor nurse, was unable to work for nearly two months. At that time, she earned $20.56 per hour.

Kathie's knees were bruised and swollen, and in the days following the accident, she continued to suffer pain in her left knee and had numbness and tingling in her left leg. She continued to seek medical treatment and was prescribed physical therapy, but her left knee pain persisted despite the physical therapy. One evening while Kathie was at work, her left leg completely gave out. An orthopedic surgeon ordered an MRI of her knee, which revealed a meniscus tear and cartilage damage in the left knee joint. The surgeon diagnosed Kathie with internal derangement of the left knee and recommended that she undergo arthroscopic surgery. On April 16, 1998, Kathie had the surgery, though she continued to suffer pain in her left knee thereafter. Ultimately, her doctor diagnosed her with a permanent injury, concluding that Kathie

suffers a permanent partial impairment (PPI) of 8% of the whole person as a result of the collision. Kathie incurred $13,103.49 in medical bills.

Following the surgery, Kathie was on crutches for 24 hours and missed work for six weeks. Kathie has not been able to return to work full time because of continuing pain in her left knee. At the time of the surgery, Kathie earned $22.29 per hour. Kathie experienced a loss of wages through 1998 of $13,642.80, and she estimated future lost wages at approximately $10,000 per year and plans to work for fifteen more years. She continues to have difficulty performing household chores, especially those that involve bending, squatting, or going up and down stairs.

The Nobles reported the accident to State Farm on July 14, 1997. A claim representative assessed the coverage available to the Nobles, and in addition to noting the existence of various types of coverage under the Underlying Policy, the representative noted the existence—but not the applicability—of the Umbrella Policy. Because Dean had rejected UIM coverage when he applied for the Umbrella Policy, State Farm's master records indicated that the Umbrella Policy did not include UIM coverage. A State Farm team manager later reviewed the coverage available to the Nobles a second time, and, relying upon State Farm's master records, noted in the file that the Umbrella Policy did not include UIM coverage. The State Farm employees who handled the Nobles' claim after that relied upon the team manager's notation that the Umbrella Policy did not provide UIM coverage.

State Farm began paying Kathie's medical bills on July 23, 1997, and between that date and the completion of Kathie's medical treatment, State Farm continued to pay medical bills as they were received. Kathie testified that State Farm "did a

great job" of paying her medical bills and the jury was instructed to that effect. Appellant's App. p. 32, 125; Tr. p. 358.

In November 1997, the Nobles filed a lawsuit against the driver of the other vehicle involved in Kathie's accident. In April 1998, the Nobles notified State Farm that they might have a UIM claim. In March 1999, the Nobles amended their complaint to include State Farm as a defendant, seeking recovery pursuant to the Underlying Policy's UIM coverage. They received $25,000—the liability limit of the other driver's insurance policy—from the driver's insurer in May 1999.

In June 1999, State Farm offered the Nobles $40,000 to settle their claim. In July 1999, a new State Farm claim representative was assigned to the Nobles' claim. She reviewed Kathie's medical bills to verify that the bills related to the accident. She and her supervisor also determined that State Farm's offer of $40,000 was appropriate, based on the extent of Kathie's injuries, the type of surgery she had received, and that she had been assigned an 8% PPI rating.

Based on the PPI rating, State Farm decided in July 1999 to send Kathie for an Independent Medical Examination (IME), and refused to pay any proceeds from Kathie's policy until the IME took place. The IME was not performed until July 2001, and by State Farm's own admission, that delay was too long. Tr. p. 151. State Farm's claim representative did not receive a report regarding the IME until October 31, 2001. The report noted the connection between Kathie's injuries and the accident, her diagnosis, the fact that her prognosis was "fair" in that she was expected to have continuing activity restrictions and weather-related symptoms, and the fact that she had a PPI rating of 8%. Appellant's App. p. 221. During the two-year period between Kathie's PPI rat-

ing and the IME, Kathie received no compensation while State Farm retained the money in an interest-bearing reserve account. State Farm admitted that this was an undue delay in the handling of Kathie's claim. Tr. p. 154.

State Farm's practice was to create a document for every claim filed called an evaluation worksheet. The company used the worksheet to aid in its determination of the value of the claim. An evaluation worksheet has never been created for the Nobles' claim, though State Farm emphasizes that the various claim representatives discussed the Nobles' claim and evaluated whether the $40,000 offer was appropriate. Thus, although the document was not in the Nobles' file, the evaluation still took place.

On August 19, 1999, the Nobles informed State Farm that they were willing to settle their lawsuit for $60,000. State Farm responded by requesting a deposition of Kathie and an IME. The parties decided to submit the case to mediation.

On January 12, 2000, the Nobles informed State Farm that they were willing to settle their claim for $75,000. Subsequently, State Farm reevaluated the Nobles' claim, taking into consideration Kathie's PPI rating, her surgery, her continuing pain, her approximate total lost wages of $13,642.80, and her total medical bills of $12,978.49. State Farm then again made an offer of $40,000 to the Nobles to settle their claim, determining internally that if the Nobles refused the offer then the case would go to trial. On August 3, 2000, the Nobles rejected State Farm's offer and indicated that they would accept $62,643.48 to settle their claim. The claim representative undertook another reevaluation of the Nobles' claim to decide whether State Farm should increase its settlement offer.

On August 8, 2000, the claim representative noticed that she did not have an up-to-date total for Kathie's lost wages and asked State Farm's attorney to review his records for that information. She also asked the attorney to determine whether Kathie had received disability payments from her employer to determine whether those payments would offset her lost wages. On August 10, 2000, the claim representative learned that Kathie had received disability benefits from her employer but that her attorney would neither release the information nor authorize State Farm's attorney to request that information from her employer.[2] Because of the inability to get exact figures, the claim representative was forced to estimate that if Kathie accepted $40,000, her total recovery from all sources would equal roughly $84,000. Noting the extent of Kathie's injuries, the surgery she received, and her PPI, the claim representative concluded that the offer of $40,000 was fair.

At some point in August 2000, the parties decided to arbitrate the Nobles' claim.[3] On September 7, 2000, the claim representative inquired of the State Farm attorney whether the case was still scheduled for mediation on September 21, 2000. She also noted that she was still waiting for Kathie's lost wage information. On September 19, 2000, the attorney told her that he would cancel the mediation. She again stated that she needed more information about Kathie's lost wages. Apparently, State Farm's attorney repeatedly failed to request Kathie's lost wage information from the Nobles.

State Farm selected John Hughes to serve on the three-member arbitration panel. Hughes is a partner in a law firm that performs defense work for State Farm. In January 2001, the Nobles objected to the selection of Hughes because of his firm's relationship to State Farm. At some point after the Nobles' objection, State Farm presented them with a choice of four attorneys in addition to Hughes— William Satterlee, who worked with Hughes, and three attorneys who had no relationship to State Farm. The Nobles continued to object to Hughes but never responded to the other arbitrators suggested by State Farm.

In October 2001, the Nobles suggested that the trial court select the panel of three arbitrators, a suggestion with which State Farm agreed. Before the trial court was able to select the arbitrators, the Nobles amended their complaint in November 2001 to include a bad faith claim against State Farm. At that time, State Farm's settlement offer remained $40,000 and the Nobles' settlement demand was $60,000.

The jury trial on the Nobles' complaint—then including claims for breach of contract, breach of the duty of good faith and fair dealing, and punitive damages— was set to proceed on May 23, 2005. On April 7, 2005, State Farm filed a motion for separate trials, proposing that the existence of UIM coverage under the Umbrella Policy, the claim for UIM benefits under the Underlying Policy, and the bad faith claim be tried separately. On May 13, 2005, the trial court denied State Farm's motion.

The trial took place from May 23–25, 2005. One of the issues presented at trial was whether the Umbrella Policy provided UIM coverage for Kathie's injuries. Fol-

---

**2.** Apparently, State Farm's attorney did not request Kathie's lost wage information from the Nobles' attorney.

**3.** State Farm states that it asked the Nobles whether they were willing to arbitrate, appellant's br. p. 10, while the Nobles contend that they requested that State Farm arbitrate their claim, appellees' br. p. 4.

lowing presentation of the evidence, the trial court withdrew the issue from the jury and entered judgment on the evidence in favor of the Nobles, finding that the Umbrella Policy included UIM coverage. The court instructed the jury to that effect.

During closing argument, the Nobles' counsel estimated Kathie's claimed lost wages—past and future—to be $175,769.20. The attorney also asked for $600,000 for pain and suffering, for a total of $775,769.20 in UIM benefits. The jury returned a verdict of $1,061,896.51 on the Nobles' claim for UIM benefits. Additionally, the jury awarded the Nobles $500,000 on their claim for breach of the duty of good faith and fair dealing. The jury found in favor of State Farm on the Nobles' claim for punitive damages. The trial court entered judgment on the jury's verdict on May 27, 2005. State Farm now appeals.

## DISCUSSION AND DECISION

### I. UIM Coverage Claim

State Farm first argues that the trial court erred in granting judgment on the evidence in favor of the Nobles, finding that the Umbrella Policy included UIM coverage for Kathie. Specifically, State Farm argues that there is an issue of fact regarding whether Dean had implied or apparent authority to bind Kathie when he rejected UIM coverage under the Umbrella Policy.

The standard of review on a challenge to a motion for judgment on the evidence is the same as the standard governing the trial court in making its decision. Judgment on the evidence is proper where all or some of the issues are not supported by sufficient evidence. We will examine only the evidence and the reasonable inferences that may be drawn there-

from that are most favorable to the non-movant, and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case. If there is evidence that would allow reasonable people to differ as to the result, judgment on the evidence is improper. *J.E. Stone Tree Serv., Inc. v. Bolger,* 831 N.E.2d 220, 227 (Ind.Ct.App.2005); *see also* Ind. Trial Rule 50(A) (governing judgments on the evidence).

State Farm argues that there is sufficient evidence supporting a conclusion that Dean was acting as Kathie's agent in procuring the Umbrella Policy and that he had apparent or implied authority to bind her when he rejected UIM coverage. Apparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent. *Menard, Inc. v. Dage–MTI, Inc.,* 726 N.E.2d 1206, 1210 (Ind.2000). It arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent. *Id.* Implied authority, on the other hand, can arise from words used, from customs, or from the relations of the parties. *Koval v. Simon Telelect, Inc.,* 693 N.E.2d 1299, 1302 (Ind.1998). The agent is authorized if the agent is reasonable in drawing an inference that the principal intended to confer authority. *Id.*

Our review of the record reveals evidence from which a reasonable inference may be drawn that Dean was acting as Kathie's agent in rejecting the UIM coverage. Kathie testified that she and Dean, who were married, historically acted as a "team" with respect to insurance matters. Appellant's App. p. 131. Kathie and Dean discussed insurance matters, after which Dean consummated the transaction in person or by telephone. *Id.* Furthermore, Dean signed most—if not all—documents relating to insurance and paid all bills re-

lating to insurance. *Id.* p. 129, 132. Indeed, the Nobles had a thirty-year history of doing business with State Farm, and during this period, Dean was the primary, if not sole, contact with State Farm relating to the Nobles' insurance coverage. Id. p. 121–22. Additionally, Kathie testified that Dean was acting on her behalf when he signed the application for the Umbrella Policy and that she expected the coverage he purchased to apply to her. *Id.* p. 132. Furthermore, even though the Nobles received the Umbrella Policy declarations page that indicated that the Umbrella Policy did not provide UIM coverage, and even though they were not billed for UIM coverage, Kathie did not complain or seek to add the coverage.

As to whether a reasonable inference may be drawn that Dean was acting with apparent authority, we observe that apparent authority stems only from the words and actions of the *principal,* not the agent. *Menard, Inc.,* 726 N.E.2d at 1210. We have been unable to find any evidence in the record establishing that communications or interactions between *Kathie,* as principal, and State Farm were sufficient to enable State Farm to form a reasonable belief that Kathie had authorized Dean's rejection of the UIM coverage under the Umbrella Policy. Thus, we cannot conclude that there is sufficient evidence supporting a conclusion that Dean was acting with apparent authority in rejecting the UIM coverage.

Turning to implied authority, we conclude, based upon the evidence described above, that there is a question of fact such that reasonable people might differ as to the result. For thirty years, Dean alone conducted all of the couple's insurance business on Kathie's behalf, signing all documents and taking part in all communications with State Farm. Based upon the parties' customs and rela-

tions, a reasonable inference may be drawn that Dean had implied authority to reject UIM coverage on Kathie's behalf. *Koval,* 693 N.E.2d at 1302. Moreover, a reasonable inference may be drawn that in failing to complain when the couple received the declarations page making no mention of UIM coverage and when they were never billed for such coverage, Kathie conferred implied authority on Dean for the rejection of coverage by acquiescing in his actions. *See id.* (holding that implied authority may be conferred by acquiescence of the principal in the actions of the agent). Thus, we are compelled to conclude that the trial court improperly granted judgment on the evidence in favor of the Nobles.

The Nobles direct us to a case that they argue must lead to judgment in their favor as a matter of law. *State Farm Fire & Cas. Co. v. Garrett,* 783 N.E.2d 329, 337 (Ind.Ct.App.2003), *trans. denied.* In *Garrett,* the insureds were a married couple. The Garretts purchased an umbrella policy from State Farm, and the husband and wife were both named insureds on the policy. The husband signed the application and the waiver of UIM coverage; the wife signed neither. After the wife got into a car accident and State Farm denied UIM coverage pursuant to the husband's waiver, this court concluded that the mere fact that the named insureds were married does not establish an agency relationship. *Id.* at 335–36. Finding no other evidence in the record establishing that the husband was acting as the wife's agent in waiving UIM coverage, we concluded that his waiver was insufficient to reject the coverage on her behalf. *Id.*

The *Garrett* court also relied upon Indiana Code section 27–7–5–2(b), which provided, in relevant part, that *"[t]he named insured* of an automobile or motor vehicle liability policy has the right, *in*

*writing,* to: (1)[r]eject both the uninsured motorist coverage and the underinsured motorist coverage provided for in this section...." (Emphases added). Subsequently, the legislature amended the statute to provide that *"any* named insured" has the right to reject UIM coverage. *Id.* (emphasis added). This court determined that because the amendment changed, rather than clarified, the previous statute, the amended statute did not support State Farm's claim that the named insured's rejection of coverage was sufficient to reject coverage on behalf of the other named insured. *Garrett,* 783 N.E.2d at 337. The Nobles argue, and the trial court agreed, that *Garrett* is directly on point with the case at hand and mandates judgment in their favor as a matter of law.

■ We interpret the *Garrett* holding differently, however. It is apparent to us that although the *Garrett* court held that the mere fact of a marriage is insufficient to establish an agency relationship, it did not hold that an agency relationship could never exist between a husband and wife. Thus, if there is other evidence of the agency relationship aside from the marriage itself, then *Garrett* does not preclude a determination that one spouse was acting as the agent of the other in procuring and/or waiving insurance coverage. Similarly, we conclude that *Garrett* stands for the proposition that Indiana Code section 27–7–5–2(b) compels a written waiver by both named insureds only in the absence of sufficient evidence of agency above and beyond the marital relationship.

Here, unlike in *Garrett,* there is evidence aside from the parties' marriage from which a reasonable inference may be drawn that Dean was acting as Kathie's agent in rejecting the UIM coverage. Dean was the only one who dealt with State Farm regarding insurance issues, Dean signed most if not all documents relating to insurance, Dean paid all insurance bills, Kathie acquiesced in his decisions throughout the entire thirty-year relationship with State Farm, including the transaction at issue, and expected that the Umbrella Policy would apply to her. Thus, State Farm is not relying on the mere fact that Dean and Kathie are married to support its assertion that she is bound by his waiver of UIM coverage and *Garrett* does not mandate a decision in the Nobles' favor as a matter of law.

Under these circumstances, the trial court erred in granting judgment on the evidence in favor of the Nobles as to the existence of UIM coverage under the Umbrella Policy. Therefore, we remand this cause for a new trial.[4]

### II. Bad Faith Claim

■ We turn next to the Nobles' bad faith claim against State Farm. Bad faith "amounts to more than bad judgment or negligence. Bad faith involves the conscious doing of wrong because of dishonest purpose or moral obliquity. It contemplates a state of mind operating with furtive design or ill will." *Johnston v. State Farm Mut. Auto. Ins. Co.,* 667 N.E.2d 802, 805 (Ind.Ct.App.1996).

Separating State Farm's actions into two categories, those involving the Underlying Policy and those involving the purported UIM coverage under the Umbrella Policy,[5] we first turn to the Underlying

---

4. Inasmuch as we are remanding for a new trial, we need not address State Farm's arguments with respect to the jury's award of damages on the Nobles' breach of contract claim.

5. We do not include State Farm's payment of Kathie's medical bills because Kathie testified that State Farm "did a great job" of paying her medical bills and the jury was instructed

Policy. In March 1999, the Nobles added State Farm as a defendant to their complaint against the driver of the other vehicle involved in Kathie's accident, seeking recovery pursuant to the Underlying Policy's UIM coverage. Specifically, the Underlying Policy provided UIM coverage in the amount of $100,000 per person. In June 1999, State Farm offered the Nobles $40,000 to settle their claim, reasoning that when added to the amount recovered from the other driver—$25,000—and the amount paid to date by State Farm for Kathie's medical expenses—over $12,000— the offer represented a total recovery of over $77,000 for the Nobles. In August 1999, the Nobles informed State Farm that they were willing to settle their lawsuit for $60,000. Essentially, the parties remained $20,000 apart until the Nobles "discovered" the possibility of recovering UIM coverage pursuant to the Umbrella Policy.

Given that the total amount of UIM coverage available to Kathie pursuant to the Underlying Policy is $100,000 and given that State Farm made its initial offer, representing a total recovery of over $77,000, within three months of being sued by the Nobles, there is simply no evidence that State Farm has in any way acted in bad faith with respect to the Underlying Policy. *See Johnston,* 667 N.E.2d at 804– 05 (noting that plaintiff had offered "no authority for the argument that taking a firm stance during mediation justifies sanction," nor had plaintiff offered an "explanation as to why her refusal to settle on [defendant's] terms is less culpable than the [defendant's] refusal to settle on her terms"). State Farm made what it calculated to be a fair offer of settlement, and given the underlying facts and circumstances of the case, we cannot conclude that its offer of $40,000 was made in bad faith.

And, indeed, all of the Nobles' arguments focus on State Farm's actions with respect to the existence of UIM coverage under the Umbrella Policy. They essentially point to three instances in which State Farm allegedly acted in bad faith: (1) when State Farm reached the conclusion that the Umbrella Policy did not provide UIM coverage; (2) when State Farm caused multiple delays and made mistakes in handling the Nobles' claim, all regarding the Umbrella Policy and occurring long after the initial offer of $40,000; and (3) when State Farm selected a non-neutral arbitrator, which also occurred long after State Farm extended its settlement offer of $40,000.

We have already determined herein that there is at least one question of fact with respect to the existence of UIM coverage under the Umbrella Policy, namely, whether Dean had authority to waive the coverage on Kathie's behalf. And, consequently, we have remanded for a new trial to determine whether there was, in fact, UIM coverage under the Umbrella Policy. Given that the jury's verdict on the Nobles' bad faith claim could only have been based on State Farm's actions with respect to UIM coverage under the Umbrella Policy, and given that the verdict was inherently based on an assumption that such coverage existed, we must vacate the bad faith verdict and damages award. If, following a new trial, the jury determines that the Umbrella Policy provides UIM coverage to Kathie, it may then consider whether State Farm's actions with respect to that coverage were made in bad faith. If, however, the jury determines that there is no UIM coverage under the Umbrella Policy, then there is no basis for a bad faith finding.

### III. *Motion for Separate Trials*

Finally, State Farm argues that the trial court erred in denying its motion for sepa-

---

to that effect. Appellant's App. p. 32, 125; Tr. p. 358.

rate trials. State Farm proposed that the claims be tried separately, as follows: (1) the claim for UIM benefits under the Underlying Policy, (2) the claim relating to the existence of UIM coverage under the Umbrella Policy, and (3) the bad faith claim.

Without ruling on whether the trial court properly denied State Farm's motion, we hereby order that upon remand, this cause be trifurcated as requested initially by State Farm.[6] We base this order upon our conclusion that the evidence needed for a determination of the value of the UIM claim pursuant to the Underlying Policy is wholly independent of the evidence needed to determine whether UIM coverage was available under the Umbrella Policy. After these issues are resolved, the Nobles may then present evidence regarding whether State Farm acted in bad faith if, and only if, the jury finds that UIM coverage was available under the Umbrella Policy.

### CONCLUSION

In sum, we have concluded that there is sufficient evidence in the record supporting the argument that Dean had authority to reject UIM coverage under the Umbrella Policy on Kathie's behalf such that reasonable people could differ as to the conclusion. Consequently, judgment on the evidence was improper and we remand for a new trial. Furthermore, inasmuch as the Nobles' bad faith claim may be based only on State Farm's actions with respect to UIM coverage under Umbrella Policy and we have remanded for a new trial on that issue, we vacate the jury's bad faith verdict and award. Finally, we order that on remand, this cause be trifurcated as explained above.

The judgment of the trial court is reversed, the jury verdicts and damages awards on the breach of contract and bad faith claims are vacated, and the cause is remanded with instructions to trifurcate the trial on the breach of contract and bad faith claims.

SULLIVAN, J., concurs.

MAY, J., concurs in part and dissents in part, with opinion.

MAY, Judge, concurring in part and dissenting in part.

I agree a new trial is in order. However, the Nobles should not be precluded from retrying the issue of State Farm's bad faith in handling their claim for underinsured benefits under the Underlying Policy.

Whether State Farm acted in bad faith when it delayed payment of the Nobles' claim is a question appropriately resolved by the trier of fact and not a reviewing court. I believe the majority is reweighing the evidence when it concludes State Farm did not act in bad faith with regard to the coverage provided by the Underlying Policy.

The majority concludes State Farm's offer of $40,000.00 was reasonable. But even if it was, there remain issues of State Farm's bad faith in the form of its delay in scheduling an independent medical examination, its selection of a non-independent arbitrator, and its failure to complete a claim evaluation sheet in violation of its own policies. These events occurred while State Farm was handling the Nobles' claim under the Underlying Policy, and it is the jury's role to determine whether State Farm's actions show bad faith.

**6.** Additionally, consistent with State Farm's initial request, we order that the issues be tried to the same jury in three stages rather than empaneling three separate juries.

I must therefore respectfully dissent on this issue.