**David HATTER and Kristina Hatter,**
**Appellants–Plaintiffs,**

**v.**

**PIERCE MANUFACTURING, INC.,**
**Appellee–Defendant.**

No. 49A02–0907–CV–659.

Court of Appeals of Indiana.

Sept. 7, 2010.

James R. Fisher, Debra H. Miller, Miller & Fisher, LLC, Indianapolis, IN, Attorneys for Appellants.

James W. Riley, Jr., Mary K. Reeder, Elizabeth Green, Riley Bennett & Egloff, LLP, Indianapolis, IN, John M. Roche, Kevin S. Taylor, Jared E. Berg, Taylor Anderson LLC, Denver, CO, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issues

While working as a Pike Township firefighter, David Hatter was injured when the cap on a fire truck's rear intake pipe was propelled off the pipe by pressurized air and the cap struck Hatter in the face. Hatter and his wife Kristina brought this products liability action against Pierce Manufacturing, Inc. ("Pierce"), the manufacturer of the fire truck. Following a jury trial and verdict in favor of Pierce, Hatter appeals.[1] Hatter presents for our review the following restated issues: 1) whether the trial court abused its discretion by failing to strike two jurors for cause; 2) whether the trial court abused its discretion in the giving of two jury instructions; 3) whether the trial court abused its discretion by excluding certain evidence; 4) whether the trial court erred

by denying Hatter's motion for judgment on the evidence as to the fault of two nonparties; and 5) whether the trial court erred by dismissing Kristina's loss of consortium claim as a sanction for a discovery violation. Regarding Hatter's jury selection issue, we conclude Hatter failed to exhaust one of his peremptory challenges and has failed to show that both of his challenges for cause were improperly denied. Further concluding the trial court did not abuse its discretion in its instruction of the jury or in excluding evidence, and finding no other error, we affirm.

### Facts and Procedural History [2]

In 1994, the Pike Township Fire Department ("PTFD") ordered two fire trucks from Pierce, including the one at issue in this case, Engine 113. A PTFD procurement committee, led by firefighter Rickey McKinney, submitted forty-eight pages of specifications to Pierce through the dealer, Midwest Fire and Safety Company, Inc. ("Midwest"). When the trucks were finished in 1995, McKinney and other firefighters traveled to Pierce's manufacturing facility, where they inspected the trucks and were satisfied that all the specifications were met. PTFD, not Pierce, trained its firefighters in the use of the trucks.

Engine 113 was a pumper truck with two large-diameter horizontal intake pipes, one opening at the front and one opening at the rear of the truck, with each opening connectable by a hose to a fire hydrant. The opening of the rear intake pipe, known as the rear intake port, was located about five feet above the ground, at head height. Inside the fire truck, the front and rear intake pipes were connected as a single,

---

1. For ease of discussion, while Kristina is also a party to this appeal, we will refer to the appellants, collectively, as Hatter where appropriate.

2. We heard oral argument on July 28, 2010, in Indianapolis. We thank counsel for their able presentations.

continuous, five-inch diameter pipe. A T-connection located near the middle of the piping brought water from either intake pipe into a vertical pipe leading to an interior reservoir; the reservoir would pump water at various pressures to outlets connected to fire hoses. The rate at which pressurized water entered the reservoir from either intake pipe was controlled by a butterfly valve inside the piping, located between the intake port and the reservoir, a few feet on either side of the T-connection. Each butterfly valve was adjusted by turning its own control wheel at the fire truck operator's station, ten complete turns between fully closed and fully open. When either the front or rear intake pipe was not in use, its corresponding butterfly valve typically remained closed and its intake port capped.

Hatter alleged the following aspects of the piping design rendered Engine 113 unreasonably dangerous. Because the front and rear intake pipes were connected, when a pressurized hydrant was connected to the front intake port, pressurized water would not only flow through the front intake pipe to the reservoir, it would also travel backwards through the rear intake pipe as far as it was able to go. With the front butterfly valve opened, pressurized water would flow past the T-connection and into the rear intake pipe until it reached the rear butterfly valve, where it would remain under pressure as long as the pressurized hydrant was connected to the front intake. So long as the rear butterfly valve remained closed, the fifteen feet of pipe between the rear butterfly valve and the rear intake port would be filled with air at atmospheric pressure. If, however, the rear butterfly valve were inadvertently opened, the laws of physics would require the pressure on either side of the valve to immediately equalize. As a result, the air in the rear intake pipe would be compressed to the same pressure as the water pressure from the hydrant connected to the front intake. If the rear butterfly valve were then closed, the pressurized air between the rear butterfly valve and the rear intake port would remain trapped under pressure, even after the fire truck was disconnected from the hydrant. After the incident, PTFD firefighter David Estes determined that this mechanism caused Engine 113's rear intake pipe to become, in effect, a pressurized air cannon.

The rear intake pipe could have been harmlessly depressurized in two ways: opening the rear butterfly valve, or opening an "air bleed" valve located inside the rear intake pipe aft of the rear butterfly valve. Transcript at 298. The parties disputed at trial whether such a depressurization should have been accomplished during Engine 113's weekly inspection done two days before the incident. The protocol for such inspections called for operation of the rear air bleed, and the PTFD log book for Engine 113 showed no activity between the Monday inspection and the Wednesday incident that could have resulted in pressurization during that intervening time. Hatter argued, however, that because the activities routinely recorded in the log book did not include all instances of using an intake pipe to fill Engine 113's tank, the pressurization may well have occurred at some point following the Monday inspection. However, the parties agreed there was no protocol for an inspection aimed specifically at ascertaining the pressurization of the rear intake pipe. Rather, Pierce concedes "[d]eposition and trial testimony established that no one had ever heard of an inlet pipe becoming pressurized." Appellee's Brief at 10.

It was also undisputed that the injury-causing potential of pressurization of the rear intake pipe would differ based on whether the cap on the rear intake port was a threaded cap or a quick-release cap.

PTFD's specifications called for a threaded cap, and Engine 113 was delivered with a threaded cap. Like a cap on a two-liter soda bottle, a threaded cap detaches only after several turns. If a threaded cap is unscrewed from a pipe under pressure, the pressurized air or water will escape gradually as the cap is turned. After Engine 113 arrived in Pike Township, and without informing Pierce, PTFD replaced the threaded cap with a quick-release or "Storz" cap. Tr. at 125.[3] A quick-release cap is removed by pushing two levers and turning the cap a quarter-turn to the left, which makes the cap come off as soon as it is loosened; thus, a quick-release cap is "either on or off." *Id.* at 191. Any pressure in the pipe will be released suddenly and may propel the quick-release cap away from the pipe with proportionate force.

On September 19, 2001, Hatter was on duty and responded to a fire call. Initially rookie firefighter Amanda Burt attempted to remove the quick-release cap in order to connect the rear intake port to a hydrant. Having difficulty doing so, Burt found Hatter, who also could not remove the cap through manual strength. Hatter then found firefighter Neil Dorbecker, who was the engineer operating Engine 113 that day. Dorbecker grabbed two spanner wrenches, which are designed to fit around and remove a quick-release cap, and went with Hatter to the back of the truck. As Dorbecker loosened the cap, Burt, who was standing next to Hatter, heard a "loud boom." *Id.* at 352. Hatter was struck in the face by the quick-release cap and "flew back about 10 feet and fell to the ground." *Id.* Hatter suffered fractured facial bones

and was taken by ambulance to the hospital.

PTFD investigated the incident through firefighter Estes, who testified he did some of the maintenance on Engine 113 himself and prior to the incident "spent many hours under the truck looking at how it's plumbed and how different things work." *Id.* at 268. Estes was unaware prior to the incident of the possibility of pressurization of the rear intake pipe. However, evidence was presented at trial that firefighters' difficulty in removing a quick-release cap may be a sign that the pipe beneath the cap is pressurized. Immediately after the incident, Estes was able to visualize "the plumbing of the rear inlet" and hypothesize that pressurized water from a hydrant could compress the air in the rear fifteen feet of pipe, such that "if that valve got closed—and it's got a cap on it and it's got a tight valve—that pressure's not going anywhere until someone relieves it." *Id.* at 279. PTFD's Deputy Chief, Don Blackwell, prepared a post-incident report that recommended at least three ways to prevent injuries like Hatter's in the future: additional training, attaching a safety cable to the quick-release cap, and placing a "warning tag" near the quick-release cap. *Id.* at 786.[4]

In 2003, Hatter sued Pierce, alleging products liability theories of defective design and failure to warn. Pierce asserted defenses attributing fault to PTFD, Dorbecker, and Angus Fire as non-parties. The case proceeded to an eight-day jury trial held June 22 to July 1, 2009.

During voir dire by Hatter's counsel, three prospective jurors—Ms. Lantry, Mr. Lisher, and Ms. Holt—stated they would

---

**3.** The quick-release cap was manufactured by Angus Fire, and PTFD purchased it through the dealer, Midwest. Pierce also sells both the threaded and quick-release caps, and a Pierce pumper truck can be ordered with either one.

**4.** Although this report was not offered or admitted into evidence at trial, neither party objected to Hatter's expert Rosenhan's testimony regarding its contents.

have difficulty following an instruction requiring liability to be determined by a preponderance of the evidence rather than ninety-nine to one hundred percent certainty. Holt answered affirmatively when asked whether she thought the preponderance of the evidence standard was "too hard on the Defendant." Partial Transcript of Voir Dire at 4. However, on follow-up questions by Pierce's counsel, Holt was asked, "[i]f the Judge tells you the law, can you follow it?" *Id.* at 5. Holt answered, "[y]es." *Id.* at 6. Prospective juror Mr. Pennington checked a box on his jury questionnaire stating he could not be a fair juror in a civil case, and during voir dire indicated a potential hardship due to his need to transport his father to the hospital for surgery. Pennington was not asked on voir dire to explain or retract his jury questionnaire statement. Hatter moved to strike Lantry, Lisher, Holt, and Pennington for cause. The trial court denied those challenges. Hatter then used peremptory strikes to remove Lantry and Lisher, as well as Mr. Grinstead, whom Hatter did not challenge for cause but deemed objectionable for other reasons. Holt and Pennington were seated on the jury.

As part of its final jury instructions, the trial court gave two of Pierce's tendered instructions over Hatter's objection, specifically, a sophisticated intermediary instruction and a safe workplace instruction, as set forth in detail below. The jury returned a verdict finding Pierce "was not at fault." Appellant's Appendix at 24. Accordingly, the trial court entered judgment in favor of Pierce and against Hatter, who now appeals.

*Discussion and Decision*

## I. Jury Selection

### A. Standard of Review

■ The grant or denial of a challenge for cause rests within the trial court's sound discretion, and we will reverse the trial court's decision only when it is "illogical or arbitrary." *Lindsey v. State*, 916 N.E.2d 230, 236 (Ind.Ct.App. 2009), *trans. denied*. "We afford substantial deference to trial judges regarding this decision because they see the jurors firsthand and are in a much better position to assess a juror's ability to serve without bias and reach a decision based on the law." *Id.*

### B. Waiver of Issue

■ Pierce raises the threshold issue of whether Hatter's claim the trial court erred by denying two for-cause challenges is properly preserved, citing the exhaustion rule of *Merritt v. Evansville–Vanderburgh Sch. Corp.*, 765 N.E.2d 1232 (Ind. 2002). There our supreme court held "a claim of error arising from denial of a challenge for cause is waived unless the appellant used any remaining peremptory challenges to remove the challenged juror or jurors." *Id.* at 1235. To preserve review of any error, the appellant bears the burden of "demonstrating that at the time she challenged the jurors for cause, she had exhausted her peremptory challenges." *Id.* (emphasis and quotation omitted). "Eventual use of all peremptory challenges is therefore not enough to satisfy the exhaustion requirement." *Id.* The rationale for the exhaustion rule is: "Where a trial court may have erred in denying a party's challenge for cause, and the party can cure such error by peremptorily removing the apparently biased venireperson, the party should do so in order to ensure a fair trial and an efficient resolution of the case." *Id.* (quotation and alteration omitted).

■ Here, the trial court denied four of Hatter's challenges for cause. On two of

those jurors—Lantry and Lisher—Hatter used peremptory strikes. On the other two—Holt and Pennington—Hatter did not use a peremptory strike, and both served on the jury. Hatter had three peremptory strikes altogether[5] and used his third peremptory strike on Grinstead. The record does not provide a clear chronology of the order in which for-cause challenges and peremptory strikes were made, but Pierce represented at oral argument, and Hatter did not dispute, that the entire panel was available for striking at a single time.[6] Thus, Hatter decided to use a peremptory strike on Grinstead, rather than Holt or Pennington, after his for-cause challenges to those jurors had already been denied.

As such, Hatter's decision to forego using his final peremptory on Holt or Pennington was a failure to comply with the exhaustion rule as to one of those jurors. In other words, even though Hatter did not have enough peremptory strikes to remove both Holt and Pennington, he could have prevented the seating of one or the other. Therefore, Hatter can prevail on his claim of error in the trial court's denial of his for-cause challenges only by

showing *both* were erroneously denied. *See Woods v. State*, 134 Ind. 35, 33 N.E. 901, 902, 904 (1893) (stating that, where appellant exhausted all peremptory challenges but one, "if any number of these jurors above one were incompetent . . . it will constitute material error," and later concluding trial court "erred in overruling appellant's challenge to at *least two of* [the challenged jurors]") (emphasis added); *cf. Merritt*, 765 N.E.2d at 1238 (holding no claim of error preserved where appellant could have, but did not, use peremptory strikes to remove both allegedly incompetent jurors when the for-cause challenges were denied). For the reasons explained below, we conclude Hatter has not made such a showing.

### C. Denial of For–Cause Challenges

■ Hatter contends both Holt and Pennington were unable to decide the case fairly and impartially, and therefore the trial court abused its discretion by not removing them for cause. The Jury Rule regarding for-cause challenges states:

> The [trial] court shall sustain a challenge for cause if the prospective juror:

---

5. *See* Ind. Jury Rule 18(b) ("In civil cases each side may challenge peremptorily three (3) jurors."); Ind.Code § 34–36–3–3(a) ("Each party in a civil case has three (3) peremptory challenges.").

6. We note as an aside our concern that application of the exhaustion rule should not turn on the chronological order in which individual jurors happen to be available to be challenged for cause or peremptorily stricken. In the hypothetical scenario where a highly objectionable juror, yet one not challengeable for cause, was preceded in such an order by a juror whom the party deemed less objectionable but nonetheless challengeable for cause, the party would have to, in order to preserve error in the denial of that challenge, use the peremptory strike that he or she otherwise would have used on the more highly objectionable juror. If the order were reversed, however, the party would be able to use that peremptory strike on the more highly objectionable juror, yet still, in the event of exhausting peremptory challenges before coming to the juror challengeable for cause, would be able to preserve error in the denial of that challenge. In order to obviate such a potential for arbitrariness, we encourage trial judges to employ the procedure the trial court apparently utilized here, by making the entire panel available first for for-cause challenges and then for peremptory strikes. *Cf. Merritt*, 765 N.E.2d at 1235 n. 3 (acknowledging "trial court judges take various approaches to jury selection and the timing of challenges for cause and use of peremptories," but stating that regardless, to preserve any error, "the party must use a peremptory against the challenged juror at whatever moments the trial judge regularly permits peremptory strikes before jury selection is complete").

. . .

(4) has formed or expressed an opinion about the outcome of the case, and is unable to set that opinion aside and render an impartial verdict based upon the law and the evidence; [or]

. . .

(8) is biased or prejudiced for or against a party to the case;

. . . .

Ind. Jury Rule 17(a). Recently in *Ward v. State*, 908 N.E.2d 595 (Ind.2009), *cert. denied*, —— U.S. ——, 130 S.Ct. 2060, 176 L.Ed.2d 417 (2010), our supreme court noted that a juror's "predisposition," initially expressed during voir dire, to favor one side of a case does not necessarily mean the juror is incapable of impartiality. *Id.* at 597. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* (quotation omitted).

The challenged juror in *Ward* initially stated he was inclined to impose the death penalty based on the hypothetical facts as he understood them, but upon further questioning affirmed he had not yet made up his mind and would reach a decision based on the law and all the facts presented. The trial court admonished the juror that the law required him to keep an open mind, consider all sentencing options as the court instructed, and remember the State had the burden of proving aggravating circumstances. The juror stated he understood and would follow that admonishment. Under these facts and circumstances, the supreme court held the trial court did not act illogically or arbitrarily by permitting the juror to serve. *Id.* at 599; *see also Dye v. State*, 717 N.E.2d 5, 18 (Ind.1999) (no error in failing to exclude jurors when trial court's questioning "revealed that these prospective jurors understood that both the law and their oath were contrary to their view favoring an automatic recommendation of death and agreed that they would follow the law and their oath"), *cert. denied*, 531 U.S. 957, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000), *post-conviction relief aff'd in State v. Dye*, 784 N.E.2d 469 (Ind.2003); *Timberlake v. State*, 690 N.E.2d 243, 262 (Ind.1997) (holding no error in failing to exclude juror who initially stated she would prefer to hear defendant testify, might have difficulty considering mitigation, and might be biased against someone who committed murder, but also stated she would follow the law as instructed and could consider some mitigating circumstances), *cert. denied*, 525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999); *Jackson v. State*, 597 N.E.2d 950, 961 (Ind.1992) (holding no error in failing to exclude jurors who initially said defendant should have to testify, but upon further questioning by defense counsel or instruction by trial court, said they could apply the law as instructed), *cert. denied*, 507 U.S. 976, 113 S.Ct. 1424, 122 L.Ed.2d 793 (1993).

■ Turning to the facts before us, we conclude that even if the trial court erred by denying Hatter's challenge to juror Pennington, it did not abuse its discretion by seating Holt on the jury. Hatter challenged Holt for cause because she initially stated she would have difficulty following an instruction requiring Pierce's liability to be determined by a preponderance of the evidence rather than ninety-nine to one-hundred percent certainty. Thus, Holt showed a predisposition to favor the defense. Yet when questioned by defense counsel regarding her responses, Holt stated unequivocally that she could follow the court's instructions regarding the applicable law. Hatter argues the question and response were not specific enough, contending the only way to rehabilitate Holt would have been to question her specifically about the preponderance standard

and obtain a specific statement that she would need only that degree of certainty to impose liability on Pierce. However, given the deferential standard with which we review trial court decisions on juror disqualification, we cannot say the trial court acted illogically or arbitrarily by believing Holt's statement that she could follow the law and render a verdict based on the court's instructions. The trial court was well positioned to evaluate Holt's demeanor and the candor and sincerity of her response, and we will not lightly second-guess its decision. Therefore, the trial court did not abuse its discretion by seating Holt on the jury.

In sum, because Hatter failed to fully comply with the exhaustion rule as required to preserve independent claims of error in the seating of either Holt or Pennington, his only available claim is that the trial court erred by seating both. This claim fails because regardless of any error in seating Pennington, the trial court did not abuse its discretion by seating Holt.

## II. Jury Instructions

### A. Standard of Review

In reviewing a trial court's decision to give a jury instruction, we consider whether the instruction correctly states the law, is supported by evidence in the record, and is covered in substance by other instructions. *Willis v. Westerfield,* 839 N.E.2d 1179, 1189 (Ind.2006). The trial court has discretion in instructing the jury and will be reversed on the latter two

issues only for an abuse of discretion. *Id.* In determining whether sufficient evidence exists to support an instruction, we "look only to that evidence most favorable to the appellee and any reasonable inferences to be drawn therefrom." *Simmons v. Erie Ins. Exchange,* 891 N.E.2d 1059, 1064 (Ind.Ct.App.2008) (quotation omitted); *cf. Aldana v. School City of E. Chicago,* 769 N.E.2d 1201, 1206 (Ind.Ct.App.2002) (noting the quantum of evidence necessary for giving an instruction is "deliberately set at a relatively low level" to ensure parties' rights "to have the trier of fact determine factual disputes thus preserving the constitutional rights to a trial by jury") (quotation omitted), *trans. denied.*

### B. Sophisticated Intermediary Instruction [7]

Hatter argues the trial court abused its discretion by giving the following sophisticated intermediary instruction:

A manufacturer has no duty to warn an ultimate user of a product's potential danger when the manufacturer sells a product to a sophisticated user.

A sophisticated user is defined as a knowledgeable intermediary who already knows of the dangers posed by the product. The sophisticated user must have knowledge at least equal to the knowledge of the manufacturer and the manufacturer must be able to rely reasonably on the sophisticated user to warn the ultimate consumer. Reliance

---

7. The parties refer to the instruction at issue as a "sophisticated intermediary" or "sophisticated user" instruction interchangeably. "Sophisticated intermediary" is the proper term here, as it is the knowledge or sophistication of PTFD as an intermediary between Pierce and Hatter, the ultimate user, that is at issue. *See First Nat'l Bank & Trust Corp. v. Am. Eurocopter Corp.,* 378 F.3d 682, 691 n. 8 (7th Cir.2004) (applying Indiana law and distinguishing between sophisticated intermedi-

ary and sophisticated user defenses); *Natural Gas Odorizing, Inc. v. Downs,* 685 N.E.2d 155, 162 n. 10 (Ind.Ct.App.1997) (noting the sophisticated user and sophisticated intermediary exceptions "are related but distinct concepts"), *trans. denied. But see Smock Materials Handling Co., Inc. v. Kerr,* 719 N.E.2d 396, 403 (Ind.Ct.App.1999) (treating sophisticated intermediary and sophisticated user defenses as interchangeable).

is only reasonable if the intermediary knows or should know of the product's danger. Actual or constructive knowledge may arise when the manufacturer has provided an adequate explicit warning of such dangers or information of the product's dangers is available in the public domain.

To determine whether a manufacturer has satisfied its duty to warn by relying on a sophisticated user, you should consider:

1. The likelihood or unlikelihood that harm will occur if the sophisticated user does not pass on the warning to the ultimate consumer;

2. The nature of the probable harm;

3. The probability or improbability that the sophisticated user will not pass on the warnings; and

4. The ease or burden of giving the warning by the manufacturer to the ultimate user.

Appellant's App. at 27.

■■■■■ Hatter does not dispute that the instruction given correctly states the law. *Cf. Natural Gas Odorizing, Inc. v. Downs,* 685 N.E.2d 155, 163–64 (Ind.Ct. App.1997) (explaining the elements of the sophisticated intermediary doctrine), *trans. denied.* Yet Hatter argues the sophisticated intermediary instruction was unsupported by the evidence at trial and therefore inapplicable. The sophisticated intermediary doctrine provides a defense to a manufacturer's duty to warn and is applicable only if the intermediary—in this case, PTFD as the intermediary between Pierce and Hatter—knew or should have known of the product's dangers. *See id.* at 164 ("[F]or the exception to apply, the intermediary must have knowledge or sophistication equal to that of the manufacturer or supplier, and the manufacturer must be able to rely reasonably on the intermediary to warn the ultimate consum-

er. Reliance is only reasonable if the intermediary knows or should know of the product's dangers.").

However, evidence presented at trial established the following, from the totality of which the jury could reasonably have inferred PTFD should have known of the danger arising from the combination of Engine 113's plumbing design with a quick-release cap. First, even though Pierce did not provide any drawings of the interior plumbing configuration, which was not part of PTFD's specifications submitted to Pierce, firefighter Estes knew that configuration well enough to accurately hypothesize the cause of Hatter's injury immediately after it occurred. Second, PTFD's firefighters were aware that pipes on fire trucks can become pressurized. *See* tr. at 304 (Estes's testimony regarding his experience as a firefighter in removing caps that contain "pressurized air or water"). Third, PTFD unilaterally decided to install, and did itself install, the quick-release cap on Engine 113. Fourth, the firefighters' difficulty in removing the quick-release cap was a potential sign that the rear intake pipe had become pressurized.

■■■■ Hatter argues that a different conclusion is pointed to by other facts: PTFD had no actual knowledge, before the incident, that Engine 113's rear intake pipe could become pressurized; because Pierce also did not know of this specific danger, it provided no warnings to PTFD, and there is no indication that information of it was available in the public domain; and there were reasons other than pressure, such as corrosion or a period of disuse, why a quick-release cap could be difficult to remove. However, the question of whether the sophisticated intermediary defense applies in a given case is ordinarily a question of fact reserved for the jury,

not one of law for the court to decide. *See Natural Gas Odorizing,* 685 N.E.2d at 164 ("Whether a manufacturer has discharged its duty under the sophisticated intermediary doctrine is almost always a question for the trier of fact.").

Because the evidence in this case does not lead unerringly to a single conclusion, there was a genuine question of fact for the jury to determine whether PTFD should have known, based on its other knowledge, that the combination of Engine 113's plumbing design with a quick-release cap posed a danger to a firefighter such as Hatter. *Cf. Smock Materials Handling Co., Inc. v. Kerr,* 719 N.E.2d 396, 400, 403–04 (Ind.Ct.App.1999) (concluding evidence did not support sophisticated intermediary instruction where design change that contributed to accident was made solely by manufacturer and unknown to employer, such that there was no reasonable inference employer or employees should have known of resulting danger). To the extent PTFD should have known of the danger, the jury could have found it highly feasible for PTFD to warn Hatter, its employee, but much less feasible for Pierce to warn Hatter, because Pierce dealt with PTFD through the regional dealer, Midwest, and PTFD—not Pierce—trained the firefighters in the use of the truck. For these reasons, the trial court's instruction, which permitted but did not require the jury to find PTFD was a sophisticated intermediary with respect to Engine 113, was supported by sufficient evidence. Stated differently, to the extent the evidence was conflicting as to the applicability of the sophisticated intermediary defense, the jury was properly instructed on a defense having some support in the evidence. Therefore, the trial court did not abuse its discretion by giving the sophisticated intermediary instruction.

### C. Safe Workplace Instruction

■ Hatter argues the trial court abused its discretion by giving the safe workplace instruction as follows:

Indiana imposes a statutory duty on an employer to provide a safe working environment for its employee. If the Pike Township Fire Department knew or should have known that David Hatter, while acting within the scope of his employment, would risk injury from the normal use of the apparatus, whether by David Hatter himself, or by others in his vicinity, then his employer had a duty to use reasonable care to avoid that harm. Pierce was entitled to rely on the Pike Township Fire Department to fulfill that duty to protect its employees.

The Pike Township Fire Department was in the best position to protect David Hatter from being injured because it, unlike Pierce, had control over the work place in which David Hatter and his co-workers used the apparatus, over the manner in which the apparatus was used, over the instruction and training of personnel with respect to the use of the apparatus, and over the equipment and techniques to be used in connection with the apparatus.

Therefore, if you find by a preponderance of the evidence that Pike Township Fire Department failed to take reasonable steps to provide a safe working environment for David Hatter and that, by failing to do so, Pike Township Fire Department breached its duty to provide David Hatter with a safe working environment, and that such breach of duty was a proximate cause of David Hatter's injuries, then you may allocate fault to the Pike Township Fire Department.

Appellant's App. at 31. Specifically, Hatter argues the instruction misstated the law and confused the jury by implying that, as a matter of law, PTFD and not

Pierce had a duty to protect Hatter against the fire truck's design defect. Pierce replies that the instruction did not direct the jury to find anything and was a permissive, not mandatory, allocation of fault instruction. We agree with Pierce.

The text of the instruction, read as a whole, shows it was a permissive allocation of fault instruction. The final sentence uses permissive, not mandatory, language to state, "*if* you find ... [PTFD] breached its duty to provide David Hatter with a safe working environment ... then you *may* allocate fault to [PTFD]." *Id.* (emphasis added). Further, the second sentence of the instruction indicates it is a question of fact for the jury to decide whether PTFD's duty encompasses the injury in this case, by stating "*[i]f* [PTFD] knew or should have known that David Hatter ... would risk injury from the normal use of the apparatus ... then his employer had a duty to use reasonable care to avoid that harm." *Id.* (emphasis added). Hatter specifically contends that two sentences in between the foregoing made improper factual findings by stating that "[PTFD] was in the best position to protect David Hatter from being injured...." and "Pierce was entitled to rely on [PTFD] to fulfill that duty to protect its employees." *Id.* However, read in context, these sentences refer to PTFD's duty to safeguard against risks inherent in "the normal use of the apparatus," not a purported duty on the part of PTFD to reverse-engineer a defective design. That is, PTFD's duty is specified as relating, not to latent defects in the fire truck, but to PTFD's undisputed "control over the work place in which David Hatter and his co-workers used the apparatus, over the manner in which the apparatus was used, over the instruction and training of personnel ... and over the equipment and techniques to be used in connection with the apparatus." *Id.* Only if the jury found PTFD was at fault with

respect to such factors did the safe workplace instruction permit, but not require, it to allocate fault to PTFD.

 In addition, Hatter argues the safe workplace instruction is not a correct statement of the law with respect to products liability principles or Indiana's safe workplace statute. We disagree. In *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277 (Ind.1983), the supreme court held the following instructions, taken together, correctly stated the law regarding a product manufacturer's duty to warn:

> The *manufacturer* of a press, such as the defendant E.W. Bliss Company, *is entitled to assume that the company using its press will adequately safeguard the press for the operation for which it is being used* and will instruct its employees in the operation of the press and the need to employ the safety devices provided.
>
> * * *
>
> You are instructed that where warnings or instructions are required to make a product nondefective, it is the duty of the manufacturer to provide such warnings in a form that will reach the ultimate consumer and inform of the risk and inherent limits of the product. The duty to provide a nondefective product is nondelegable.

*Id.* at 281–82 (emphasis added). The supreme court explained that a manufacturer may not escape liability for a defectively manufactured or designed product simply by selling the product to an intermediary such as an employer. *Id.* at 282. However, that does not make the manufacturer an absolute guarantor that the product will be used in a safe manner. *See id.* at 283 ("[T]he manufacturer has a duty to warn of potential dangers associated with the use of the product that is otherwise free from latent design or manufacturing de-

fects only where [the manufacturer] has some control over the manner in which the employer incorporates the product into [the employer's] operation."). At common law it is "well settled that an employer has a duty to use reasonable care to provide its employees with a reasonably safe working place, including reasonably safe appliances." *Mannon v. Howmet Transp. Serv., Inc.*, 641 N.E.2d 70, 73 (Ind.Ct.App. 1994), *aff'd on reh'g*, 645 N.E.2d 1135 (Ind. Ct.App.1995). In addition, Indiana imposes a statutory duty on employers to "establish and maintain conditions of work which are reasonably safe and healthful for employees, and free from recognized hazards that are causing or are likely to cause death or serious physical harm to employees." Ind.Code § 22–8–1.1–2.[8]

Thus, the safe workplace instruction did not misstate the law by referring to PTFD's duty to take reasonable safety precautions in its use of the fire truck. In addition, the instruction was supported by the following evidence of a nexus between PTFD's manner of equipping and using the fire truck and Hatter's injury: 1) PTFD's replacement of the threaded cap with the quick-release cap, which Hatter's experts conceded was a necessary step in the chain of events leading to Hatter's injury; 2) PTFD's failure to attach a safety cable to the quick-release cap, which PTFD recommended as a precautionary measure in its post-incident report; and 3) PTFD's alleged negligence in performing the fire truck's weekly inspection, which if properly done could have released any pressure in the rear intake pipe via the air bleed.

As shown by the parties' arguments and our review of the record, this was a complex case with factual issues vigorously contested at trial. While we are not without sympathy for Hatter's arguments, our review of whether sufficient evidence exists to support a jury instruction requires deference to the trial court's weighing of the evidence in its exercise of discretion. *See Simmons*, 891 N.E.2d at 1064. Based on all the evidence presented at trial, we conclude the trial court did not err by giving the sophisticated intermediary instruction or the safe workplace instruction.

### III. Exclusion of Evidence

#### A. Standard of Review

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Dorman v. Osmose, Inc.*, 873 N.E.2d 1102, 1108 (Ind.Ct.App. 2007), *trans. denied.* An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

#### B. Testimony Regarding Safer Alternative Designs

Hatter argues the trial court abused its discretion by making the following ruling, during direct testimony by Hatter's expert Rosenhan:

Q. Are there any other hardware solutions?

A. Yes, sir. We talk about pressure gauges, but that's merely a warning. That's not a solution. The other would be an automatic air release valve, which are a common commercial item.

---

8. While this statute implies an employee is entitled to rely on an employer to provide a safe workplace, not necessarily that a manufacturer is entitled to rely on an employer in that regard, it still supports the safe workplace instruction as permitting the jury to allocate fault for Hatter's—the employee's—injury to his employer, PTFD. The instruction was not exculpatory; it did not require or permit the jury to find that due to PTFD's statutory duty, Pierce was discharged of its duty.

Q. Were they common commercial items in 2001?

A. Oh, yes, sir. They've been around for years. They're used in stand pipes, certain sprinkler systems, in industry. They're both vacuum and pressure breakers. Very common.

* * *

Q. Were those pressure release valves available in 1995?

[Pierce's counsel]: Lack of foundation, Your Honor.

The Court: Where are we going?

[Hatter's counsel]: It's just a hardware solution. It's an alternative that would have avoided this problem, Your Honor. It's an alternative, safer (*unclear*).

[Pierce's counsel]: Objection. Relevance.

The Court: I'm going to sustain the objection.

Tr. at 739–40. However, the trial court allowed Hatter to present other testimony regarding safer alternative designs. For example, earlier in the trial, Hatter's expert Dr. Miller testified the pressurization hazard could have been minimized by placing "some kind of a pressure relief valve at the location where the fireman would be— something he could reach to and activate to make sure that there wasn't pressure in the line." *Id.* at 89. Dr. Miller confirmed on cross-examination that placing an additional air bleed at the rear of the truck "would be a good safety feature." *Id.* at 103.

■ Although evidence of safer alternative designs was relevant to Hatter's case, a trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by considerations of needless presentation of cumulative evidence. *See* Ind. Evidence Rule 403. In making an offer to prove in response to Pierce's initial foundation objection, Hatter

merely stated that evidence regarding pressure release valves was relevant to the question of safer alternative designs. Yet Hatter's other expert had already testified that such valves would have been a safer alternative design. Therefore, the trial court acted within its discretion to exclude further testimony as needlessly cumulative of what had already been presented.

## C. Exclusion of Rebuttal Testimony

■ Hatter argues the trial court erred by denying his request to re-call firefighter Estes as a rebuttal witness, in that Estes would have "complete[d] the impeachment of the defense expert" by testifying that certain tests done by the expert were performed under conditions— vacuum rather than pressure, and involving a leak—leading to an invalid result. Appellants' Brief at 34. Pierce introduced those tests to counter Estes's testimony that it took "[p]robably less than a quarter turn," tr. at 303, to open the rear butterfly valve an appreciable amount, which supported Hatter's contention that inadvertent opening of the valve, and thus unexpected pressurization of the rear intake pipe, was not unlikely. In ruling to exclude Estes's proposed rebuttal testimony, the trial court noted the jury already "ha[d] . . . in front of them" the issue of testing and the trial had already taken up more than five days. *Id.* at 1059–60.

■ Rebuttal evidence is that which tends to explain, contradict, or disprove an adversary's evidence. *White v. White*, 655 N.E.2d 523, 529 (Ind.Ct.App. 1995). "The scope of rebuttal is a matter left to the discretion of the trial court." *Baker v. State*, 483 N.E.2d 736, 737 (Ind. 1985). In reviewing a trial court's decision to exclude rebuttal evidence on relevance grounds, our supreme court has stated that "denying the opportunity to present evidence on peripheral matters in rebuttal

is not error." *Crawford v. State,* 770 N.E.2d 775, 781 (Ind.2002). Under Indiana Rule of Evidence 403, even relevant evidence may be excluded if its probative value is substantially outweighed by, among other factors, undue delay. Estes's rebuttal testimony would have related to an issue—the likelihood of inadvertent pressurization—on which Hatter already had an opportunity to present evidence, and Hatter admits the excluded testimony was relevant only to provide further impeachment of a defense expert Hatter already cross-examined. Thus, the trial court acted within its discretion to exclude the testimony as marginally relevant and leading to undue delay, factors the trial court referenced in its ruling.

## IV. Non–Party Defenses

 Hatter contends the trial court erred by allowing the jury to allocate fault to two of the three non-parties named by Pierce: Angus Fire and firefighter Dorbecker.[9] Hatter does not challenge a specific jury instruction, rather he contends the trial court should have granted his motion for judgment on the evidence as to Angus Fire and Dorbecker. As such, Hatter's challenge goes to the sufficiency of the evidence. *See* Ind. Trial Rule 50(A); *State Farm Mut. Auto. Ins. Co. v. Noble,* 854 N.E.2d 925, 931 (Ind.Ct.App.2006), *trans. denied.* In reviewing a trial court's decision to grant or deny a motion for judgment on the evidence, we examine only the evidence and reasonable inferences most favorable to the nonmovant. *Noble,* 854 N.E.2d at 931. Judgment on the evidence is proper only where there is no substantial evidence supporting an essential issue in the case; "[i]f there is evidence that would allow reasonable peo-

ple to differ as to the result, judgment on the evidence is improper." *Id.*

As to Angus Fire, the evidence most favorable to Pierce as nonmovant indicates Angus Fire was the manufacturer of the quick-release cap that struck Hatter, and the cap was not equipped with any pressure release valve or safety cable. After the incident, PTFD replaced the cap with a different quick-release cap, also manufactured by Angus Fire, that had a pressure release valve, and additionally recommended attaching a safety cable. As to Dorbecker, the evidence most favorable to Pierce is that the firefighters' difficulty in removing the quick-release cap was potentially a sign the pipe was pressurized, and therefore Dorbecker should have taken precautions when removing it. Because the jury could reasonably have concluded, even if it had found PTFD to be at fault, that Angus Fire and Dorbecker also bore some percentage of fault for Hatter's injury, the denial of Hatter's motion for judgment on the evidence as to these non-parties was proper.

## V. Dismissal of Consortium Claim

Hatter argues the trial court abused its discretion by granting Pierce's motion, mid-trial, to dismiss Kristina's loss of consortium claim as a sanction for a discovery violation. As Hatter acknowledges, because consortium claims are derivative in nature, *Watters v. Dinn,* 666 N.E.2d 433, 438 (Ind.Ct.App.1996), this issue was rendered moot by the jury's finding in favor of Pierce on the issue of liability. Accordingly, because Hatter has shown no reversible error in the judgment in favor of Pierce, we need not address this issue.

## Conclusion

Hatter failed to exhaust one of his peremptory challenges and has not shown

---

9. *See* Ind.Code § 34–51–2–7(b)(1) ("In assessing percentage of fault, the jury shall consider the fault of all persons who caused or contrib-uted to cause the alleged injury ... regardless of whether the person was or could have been named as a party.").

both of his challenges for cause were improperly denied. Further, the trial court did not abuse its discretion in the giving of jury instructions or in excluding evidence and did not err by denying Hatter's partial motion for judgment on the evidence. The judgment of the trial court is therefore affirmed.

Affirmed.

FRIEDLANDER, J., and KIRSCH, J., concur.